**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

---

THE COLUMBIA COUNTY CORRECTIONS
OFFICER'S BENEVOLENT ASSOCIATION, LOCAL
3828, NEW YORK STATE LAW ENFORCEMENT          1:20-cv-00684 (BKS/CFH)
OFFICERS UNION, DISTRICT COUNCIL 82, AFSCME,
AFL-CIO; and, MATTHEW HOGENCAMP, as President
of the Columbia County Corrections Officer's Benevolent
Association, Local 3828, New York State Law
Enforcement Officers Union, District Council 82,
AFSCME, AFL-CIO, individually and on behalf of all
similarly situated members,

Plaintiffs,

v.

MATT B. MURELL, in his official capacity as Chairman
of the Board of Supervisors of Columbia County, P. J.
KEELER, JR., in his official capacity as County Treasurer
of Columbia County, RONALD CAPONERA, in his
official capacity as County Comptroller of Columbia
County, ROBERT J. FITZSIMMONS, in his official
capacity as County Attorney of Columbia County,
MICHAELE WILLIAMS-RIORDON, in her official
capacity as Human Resources Director of Columbia
County, DAVID P. BARTLETT, in his official capacity as
Sheriff of Columbia County, the COLUMBIA COUNTY
BOARD OF SUPERVISORS, and the COUNTY OF
COLUMBIA,

Defendants.

---

**Appearances:**

*For Plaintiffs:*
Jeffrey P. Mans
Law Office of Jeffrey P. Mans
P.O. Box 11-282
Albany, New York 12211

*For Defendants:*
Elena DeFio Kean
Kristin T. Foust
Hinman Straub P.C.
121 State Street
Albany, New York 12207

**Hon. Brenda K. Sannes, United States District Judge:**

**MEMORANDUM-DECISION AND ORDER**

## I.    INTRODUCTION

This action arises in the context of the COVID-19 pandemic and as a result of Defendant

Columbia County Board of Supervisors' adoption of a resolution imposing an involuntary six-

day work furlough, without pay, on all members of the Plaintiff Columbia County Corrections

Officer's Benevolent Association, Local 3828, New York State Law Enforcement Officer's

Union, District Council 82, AFSCME, AFL-CIO ("Corrections Union"). (Dkt. No. 1). The

Corrections Union and its President, Matthew Hogencamp, bring this action on behalf of all

members, under 42 U.S.C. § 1983, alleging that Defendants violated the Contracts Clause of the

United States Constitution; Plaintiffs also allege violation of the New York Constitution and the

New York Municipal Home Rule Law § 10. (Dkt. No. 1). Presently before the Court is Plaintiffs'

motion for a temporary restraining order and preliminary injunction under Federal Rule of Civil

Procedure 65. (Dkt. No. 2). Defendants oppose the motion. (Dkt. No. 13). On August 12, 2020,

the Court heard oral argument on Plaintiffs' motion.[1] Having carefully considered the parties'

---

[1] Following oral argument, Plaintiff submitted a letter brief, (Dkt. No. 19), in response to Defendants' filing of the County's Continued Declarations of a Local State of Emergency, (Dkt. No. 18). Defendants filed the Columbia County State of Emergency Declarations per the Court's direction, in response to Plaintiffs' assertion that the Declarations were not on the County's website. Plaintiff's letter brief in response, however, was not authorized by the Court, nor was it responsive to the Declarations; it refers to recent news articles regarding schools reopening in New York and sales tax collections in Greene and Columbia Counties. (Dkt. No. 19). The Court has not considered Plaintiffs' letter in connection with the pending motion.

2

submissions, the Court denies Plaintiffs' motion. The following constitutes the Court's findings

of fact and conclusions of law in accordance with Rule 52(a)(2).

## II.    FINDINGS OF FACT[2]

### A.    Plaintiff Corrections Union

The Corrections Union is the sole collective bargaining representative for all full-time

corrections officers, corporals, sergeant and assistant chief corrections officers, including head

cook and cook, employed by Columbia County and Columbia County Sheriff. (Dkt. No. 2-1, ¶

3). The Corrections Union and Columbia County have a "collective bargaining relationship of

approximately thirty (30) years." (Dkt. No. 2-1, ¶ 3). "[O]ver the years," the Corrections Union

and Columbia County have negotiated several collective bargaining agreements ("CBA")

regarding "the parties' terms and conditions of employment." (Dkt. No. 2-1, ¶ 5). "As a joint

employer," Defendant Sheriff David Bartlett "was a signatory to the CBA" with the Corrections

Union. (Dkt. No. 13-2, ¶ 7). The current CBA expired on December 31, 2019, (Dkt. No. 2-2), but

remains "in full force and effect until a new agreement is entered." (Dkt. No. 2-1, ¶ 6). Because

the CBA expired, "the corrections officers' salary has not increased in 2020." (Dkt. No. 13-2, ¶

8). The parties' negotiations for a new CBA "pause[d]" when the COVID-19 pandemic struck—

not only because the parties were unable to meet, but because of "the financial uncertainty."

(Dkt. No. 13-2, ¶ 8).

---

[2] The facts are taken from the affidavits and attached exhibits submitted in support of this motion, (*see* Dkt. Nos. 1, 2, 17), and in opposition. (*See* Dkt. No. 13). *See J.S.R. ex rel. J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018) ("In deciding a motion for preliminary injunction, a court may consider the entire record including affidavits and other hearsay evidence."); *Fisher v. Goord*, 981 F. Supp. 140, 173 n.38 (W.D.N.Y. 1997) (noting that a "court has discretion on a preliminary injunction motion to consider affidavits as well as live testimony, given the necessity of a prompt decision"). The "findings are provisional in the sense that they are not binding on a motion for summary judgment or at trial and are subject to change as the litigation progresses." *trueEX, LLC v. MarkitSERV Ltd.*, 266 F. Supp. 3d 705, 721 (S.D.N.Y. 2017); *accord Fair Hous. in Huntington Comm. Inc. v. Town of Huntington*, 316 F.3d 357, 364 (2d Cir. 2003).

B.      **Background**

On March 7, 2020, based on the "novel coronavirus, COVID-19, outbreak," which the

World Health Organization has designated "a Public Health Emergency of International

Concern," New York Governor Andrew M. Cuomo issued an Executive Order declaring "a State

disaster emergency for the entire State of New York." (Dkt. No. 2-3, at 1). Between March 7 and

March 27, 2020, the Governor continued to issue Executive Orders reducing "the percentage of

employees in the workforce, clos[ing] restaurants, bars, gyms, shopping malls, and ultimately

bann[ing] gatherings of any size." (Dkt. No. 13-1, at 4).

On March 16, 2020, following the Governor's Executive Order, Defendant Matt Murell,

Chairman of the Columbia County Board of Supervisors, "issued a Declaration of a Local State

of Emergency" in Columbia County, New York. (Dkt. No. 13-1, at 4, 40–42). Columbia County

"is primarily a rural county [that] has grown to serve as a bedroom community to property

owners who work in New York City." (Dkt. No. 13-3, ¶ 18). As the state shut down, "it quickly

became apparent" to the County that "this was not going to be a short shutdown and the impact

was potentially [financially] catastrophic"[3] as a result of, among other things, lost sales tax

revenue. (Dkt. No. 13-1, at 5). "As a municipality," it is "legally required to have a balanced

budget" and "cannot run a deficit." (Dkt. No. 13-1, at 6). "The County receives 4% of all sales

tax revenue generated in the County." (Dkt. No. 13-3, ¶ 16). "The largest generator of sales tax

for the County is from gasoline sales," followed by "automobile dealers, building material and

supplies, and restaurants and other eating places." (Dkt. No. 13-3, ¶ 17). "In light of the COVID-

---

[3] "The County had no general idea in mid-March that the shutdown would last for as long as . . . it did." (Dkt. No. 13-1, at 4–5). At first, its "focus was working with Emergency Management, 911 Emergency Services, and the County Health Department to develop protocols to: (i) set up testing, (ii) ensure medical tracing, (iii) obtain[e] Personal Protective Equipment for staff; (iv) provid[e] services to the residents of the County that may be infected or susceptible to the virus (such as medical care, meals for the elderly and other public services); . . . (v) work[] to stop the spread of the virus; [and (vi)] to ensure that non-essential employees could work safely and effectively." (Dkt. No. 13-1, at 5).

19 shutdown, people were staying home as non-essential gatherings were prohibited under Governor Cuomo's Executive Order." (Dkt. No. 13-1, at 5). Further, not only had "the price of gasoline dramatically dropped during" March and April 2020, but gasoline "was not being purchased" because people were not traveling, resulting in "significantly lower" revenue for the County from gasoline sales tax. (Dkt. No. 13-1, at 5–6).

During March 2020, Chairman Murell "worked closely with the County Controller and Treasurer," respectively Defendants Ronald Caponera and P.J. Keeler, Jr.,[4] "to have a true understanding of the financial implications of the pandemic's shutdown." (Dkt. No. 13-1, at 4). "In mid to late March 2020, [Treasurer Keeler] began to review each line item of the County budget to determine actual expenditures and revenue" and "assess and estimate the anticipated shortfalls that the County would experience as a result of the COVID-19 crisis." (Dkt. No. 13-3, ¶ 8). Treasurer Keeler identified five areas of concern and, based on a "partial and/or temporary short term full shutdown," projected the revenue shortfalls in each area as follows: (i) $3.5 million loss of sales tax revenue; (ii) $3.5 million loss of New York State aid to counties; (iii) $1.0 million department revenue losses; (iv) $2.0 million increase in delinquent real property tax payments; and (v) $2.0 million increase in outstanding reimbursements due and owing from the State and federal government. (Dkt. No. 13-3, ¶¶ 9–10). In total, Treasurer Keeler projected a $12 million shortfall, and in late March 2020, gave Chairman Murell a report containing his projections.[5] (Dkt. No. 13-3, ¶ 8). In making these projections, Treasurer Keeler also considered

---

[4] As County Treasurer, Keeler is Columbia County's "chief fiscal officer" and is "the custodian of all money belonging to the County" and "is required to keep a true account of all receipts and expenditures of the County." (Dkt. No. 13-3, ¶ 3). Treasurer Keeler is also Columbia County's Emergency Medical Services coordinator and has "worked closely with emergency management services during this pandemic." (Dkt. No. 13-3, ¶ 1).

[5] According to Treasurer Keeler, prior to the pandemic, the County "was in reasonably good financial condition," and had "reserves available to use for these shortfalls, including the use of $2.8 Million Dollars of tax stabilization funds." (Dkt. No. 13-3, ¶ 31). "Absent that reserve the County would have had a more severe issue." (Dkt. No. 13-3, ¶ 31).

"lost revenue in County departments due to the closure of offices, including licensing fees, airport sales supplies, motion fees with the county court, public health fees associated with construction, mental health fees, central services and department of social services fees."[6] (Dkt. No. 13-3, ¶ 26). Using these projections, Treasurer Keeler worked with Chairman Murell, the Board of Supervisors and the County department heads to "devise a plan to, at a minimum, create savings of $10 Million Dollars," though Treasurer Keeler acknowledged, that "[e]ven this amount would not meet the shortcomings anticipated on the mild side." (Dkt. No. 13-3, ¶ 29).

Chairman Murell, Controller Caponera, and Treasurer Keeler "created a small working group to review the information coming out and make recommendations to present to the full Board of Supervisors." (Dkt. No. 13-1, at 4). Chairman Murell's "greatest concern" and "goal" as Chairman "was to do whatever was necessary to ensure that no one was laid off or terminated, thereby leaving them without health insurance in the middle of a pandemic." (Dkt. No. 13-1, at 6). To accomplish this, the County "had to work swiftly, efficiently and creatively to balance the budget and hopefully not lose jobs"—they met as often as three times per week until mid-June 2020. (Dkt. No. 13-1, at 4, 6). They also began working with "other department heads to explore cost saving measures"; "[t]his was a multi-step process" and "included actions taken on many levels and the input of many people." (Dkt. No. 13-1, at 6).

In mid-April 2020, County Human Resources Director Williams-Riordan prepared the "pay daily rates" for each County employee to enable the County to calculate "the net cost of daily wages." (Dkt. No. 13-4, ¶ 10). Director Williams-Riordan provided this information to

---

[6] According to Treasurer Keeler, to date, with the court systems closed, "the collected County court fees are down $400,000 year to date." (Dkt. No. 13-3, ¶ 26). Regarding real property taxes, Treasurer Keeler stated that the County not only saw "unpaid real property taxes rise" as "unemployment rates soar," but due to court closures and the Governor's orders, the "County was unable to proceed with its in rem foreclosure proceedings for delinquent taxes for 2016." (Dkt. No. 13-3, ¶ 27). "This has a negative impact on County cash flow." (Dkt. No. 13-3, ¶ 27).

Treasurer Keeler and Controller Caponera, "who then calculated the additional amount of anticipated savings by way of employer payroll tax and retirement system contributions." (Dkt. No. 13-4, ¶ 10). As part of the County's consideration of additional cost-cutting measures, including a hiring freeze, Director Williams-Riordan provided the Chairman Murell, Controller Caponera, and Treasurer Keeler with "documentation as to presently open and available positions within the County and base salaries associated with these open, unfilled budgeted positions." (Dkt. No. 13-4, ¶ 13). The County determined that a hiring freeze would not be enough, however, and began discussions regarding a "13 day furlough program of all County staff during a 6 month period." (Dkt. No. 13-4, ¶ 14). According to Director Williams-Riordan, in deciding whether a furlough was a useful course of action, the County considered: "the efficient delivery of County services to the public in the middle of the pandemic, continued health insurance for employees, attempts to avoid layoffs/terminations, and the potential impact of overtime as a result of the furloughs." (Dkt. No. 13-4, ¶ 14).

In April 2020, the County notified Defendant Columbia County Sheriff David Bartlett, as a department head, of the financial issues the pandemic was causing. (Dkt. No. 13-2, ¶ 2). As Sheriff, Bartlett is "a co-employer with the County . . . of the members of [the Corrections Union] as well as the Deputy Sheriff's Officers, which are represented by separate bargaining units. (Dkt. No. 13-2, ¶ 2). The County instructed Sheriff Bartlett "to cut 20%" of equipment purchases and "outside contractual obligations." (Dkt. No. 13-2, ¶ 10). Sheriff Bartlett's budget cut plan "had no impact on staff or the CBA rights of the Corrections Union or Deputy Sheriff's Union." (Dkt. No. 13-2, ¶ 10).

On May 8, 2020, Chairman Murell issued a "COVID-19 Update" memorandum to all County employees:

> [T]he pandemic and the related shutdown has had devasting effects on the economy, both nationally and locally. Unfortunately, Columbia County is not immune to this crisis.
>
> Columbia County's sales tax revenue, which is a substantial portion of its annual income, is largely derived from gas sales and restaurant/tourism. With people staying home and businesses shuttered, the lost income and revenue has had significant impact on the County and its ability to operate. While the total numbers are not clear, we have been informed that the projected shortfall could be as high as $20 Million Dollars. As a County, we are required to balance the budget and cannot run in a deficit. As you can imagine these projections place the County's financial footing in dire straits. The County does not have a $20 Million Dollar reserve.
>
> To that end, the County has begun to implement various strategies to address the deficit and create cost savings. These include substantial cuts to departmental budgets by 20%, a hiring freeze (except in filling essential and critical positions), canceling the hiring of all summer youth, and deferring all contractual bonuses at the present time.
>
> While we are hopeful that there may be some relief through State and Federal legislation, we cannot rely on such options, particularly in light of the fact that the NYS budget is billions of dollars in the red, as reported by the Governor at his daily briefings. Please note that we have been in communication with the various union representatives and view the process as collaborative to ensure the best options for the County and its employees. We recognize that this is a frightening time for all of us, so we want to assure you that we are doing everything in our power to avoid full scale layoffs. We will be examining other options and cost saving measures to address the shortfall.

(Dkt. No. 13-1, at 48). In addition to the measures Chairman Murell described in the memorandum, the County "negotiated with [its] largest union a deferral of certain contractual bonuses to be paid at a later date," requested and received an agreement from "all elected County officials to give back 10% of their salary for a six-month period spanning from June–November 2020," and dedicated $2.8 million in tax stabilization funds from the County's fund balance. (Dkt. No. 13-1, at 7). These measures, however, failed to bridge "the real and conservative shortfalls." (Dkt. No. 13-1, at 7).

On May 13, 2020, on the recommendation of the Finance Committee, the County Board of Supervisors passed Resolution No. 161-2020 authorizing the implementation of "emergency fiscal programs and budget amendments in response to the COVID-19 pandemic." (Dkt. No. 13-1, at 50). Resolution No. 161-2020 states that "Columbia County has reviewed the impacts of COVID-19 on the County and County Budget and has recognized . . . revenue loses [sic] estimated from 15 million to upward of 20 million dollars due to lost sales tax, mortgage tax, transfer tax and state and federal revenue stream slowdowns as well as delays in collection on accounts receivable." (Dkt. No. 13-1, at 50). It implemented ten "cost cutting measures," including contractual, equipment, road work, outside agencies, and capital expenditure reductions, a hiring freeze, pausing the summer intern program, an involuntary 13-day pay period (with 1-day furlough), and a "voluntary [two-month] full furlough plan."[7] (Dkt. No. 13-1, at 50–51). It also proposed "use of [$2.8 million in] tax stabilization funds." (Dkt. No. 13-1, at 8, 51). Because the "cost cutting measures are not sufficient to allow enough funds to continue

---

[7] It exempted "several groups from the furloughs: Solid Waste, Office of the Aging's nutrition site, the Health Department, the Sheriff's department (both Deputies and Corrections), 911 and Emergency Management." (Dkt. No. 13-1, at 8). The exemption of these groups initially "was not a decision that furloughs and give backs would not be explored, but rather that more review and consideration was needed." (Dkt. No. 13-1, at 8). The Solid Waste department, which is staffed by part-time employees, "who have little to no contractual benefits," were "operating 7 day a week to handle the processing of trash from residents including those positive with the virus"— making personal protective equipment important. (Dkt. No. 13-1, ¶ 34). Though those employees "were not furloughed" "the department head provided additional cuts to the department in an amount that equaled their pay daily rate for the six days." (Dkt. No. 13-1, ¶ 35). The County could not furlough Health Department employees as they "were on the front lines dealing directly with the public to handle quarantine, tracing, and other critical duties," and staff had been "working 6–7 days per week" and "voluntarily waived compressed work week agreements." (Dkt. No. 13-1, ¶ 35). Even so, the Health Department approved furloughs representing "approximately a 2-day furlough for the entire department." (Dkt. No. 13-1, ¶ 35). Furloughs were not possible for the nutrition site of the Office for the Aging, which is responsible for "the preparation of 'meals on wheels' for [County] seniors," the demand for which "increased dramatically during the crisis." (Dkt. No. 13-1, ¶ 36). Further given the "critical and essential" services provided by the Emergency Management department, which is "comprised of three people working under an annual stipend without benefits and minimal pay," and who work "when crisis and emergency require," and were therefore "providing substantially more time than typically is required for this stipend position," the County determined not to include these employees in the furlough. (Dkt. No. 13-1, ¶ 37). The County also determined that because the 911 Dispatchers department was staffed "24-7" by employees working 12-hour shifts, these employees could not be furloughed "without impacting services or triggering substantial overtime, thereby eliminating any savings." (Dkt. No. 13-1, ¶ 38).

mandated county operations and services," the resolution noted that the "County would consider

the issuance of a Revenue Anticipation Note (RAN) in an estimated amount of" $10 million to

$15 million" "for purposes of maintaining fund balance and cash flow needs of the County."[8]

(Dkt. No. 13-1, at 51).

On May 14, 2020, Chairman Murell issued a memorandum to all county employees

advising that Resolution 161-2020 had been passed "outlining the newly adopted reductions,

including two (2) furlough programs for Columbia County employees." (Dkt. No. 13-1, at 54).

The involuntary furlough plan (13-day pay period with 1 day furlough) applied to all County

employees not subject to a CBA as well as members of the United Public Service Employees

Union, the County's largest union. (Dkt. No. 13-1, at 8).

In May 2020, after Resolution 161-2020 was passed, the County received updated

projections from the New York State Association of Counties ("NYSAC") and [Treasurer

Keeler] based upon sales tax revenue reports and other information. (Dkt. No. 13-1, at 8).

Treasurer Keeler prepared an updated financial projection based on the information the County

had received "to date," "such as sales tax reports, financial records and information as well as the

updated report from" NYSAC. (Dkt. No. 13-3, ¶ 12). The number in the NYSAC report

projecting sales tax loss ($3.86 million), is, according to Treasurer Keeler, conservative. (Dkt.

---

[8] Treasurer Keeler also explained the County's issuance of a "Revenue Anticipation Note" as part of their preparation for coming shortfalls:

> [W]hile savings provided to date represent just over $10 Million Dollars, the County needs to prepare for the remaining shortfall and the potential that the losses will exceed $13 Million Dollars. As such, the County has issued a Revenue Anticipation Note to allow the County to borrow up to $15 Million Dollars if absolutely necessary. However, the borrowing of funds has significant drawbacks, such as paying interest, impacting the financial condition of the County, the requirement to pay back funds, and impact on taxes. Thus, the use of the line is a last resort, which if there is no federal assistance and further delay in the rebound of the economy of the County, it will be absolutely necessary.

(Dkt. No. 13-3, ¶ 32).

No. 13-3, ¶ 22). He explained that in May 2020, the "County received notification of the sales tax numbers covering the period through March 30, 2020, and "reflected a reduction in sales tax revenue of $770,000.00 to the County." (Dkt. No. 13-3, ¶¶ 22–23). According to Treasurer Keeler, "[t]his number was significant since the shutdown was essentially only the last two weeks of March." (Dkt. No. 13-3, ¶ 23). From the "actual sales tax receipts" the County had received, Treasurer Keeler found that "[t]he sales tax numbers through April 30, 2020 reflect[ed] a year to date reduction in sales tax revenue of $1.8 million." (Dkt. No. 13-3, ¶ 23). Specifically, sales tax revenue for March and April 2020 was $4,416,167.05 compared to $6,294,076.78 for the same two month period in 2019." (Dkt. No. 13-3, ¶ 23). Treasurer Keeler concluded, based on this "trend," that "a continued reduction in sales tax will meet the $3.8 Million Dollar projection and more likely reflect a number between $3.8 Million and $9.3 Million Dollars." (Dkt. No. 13-3, ¶ 24). Further, based on the NYSAC report, "the failure on the part of the federal government to provide direct aid to the states," as well as the information the County has received from the Governor's Office,[9] Treasurer Keeler has advised that the County must be prepared "for a shortfall of state aid in the minimum amount of $4,384,872." (Dkt. No. 13-3, ¶ 25).

---

[9] Chairman Murell states that he has "participated in a daily weekday Capital Region call with the Governor's Office," during which he received "updates on the status of reopening" and county leaders could "express [their] concerns and financial issues to the Governor's staff" and discuss "federal aid." (Dkt. No. 13-1, 12). Chairman Murell did not get the "sense [that] any such aid [was] forthcoming" from these discussions. (Dkt. No. 13-1, 12).

In addition, because of the County's membership in NYSAC, Chairman Murell has been able to discuss "their experiences in response to COVID-19" with other counties. (Dkt. No. 13-1, ¶ 40). From these discussions, Chairman Murell learned that "at least six other counties," including Greene, Allegany, Otsego, Livingston, Sullivan, and Ontario, "have either furloughed employees to date or announced intentions to lay off employees in 2021." (Dkt. No. 13-1, 12). Further, the County has "been generally informed that [it] should anticipate a 20% reduction in state aid," (Dkt. No. 13-1, at 12), and has learned that the state has cut aid to cities by 20%, reinforcing to the County "the prediction that the same will occur for the counties." (Dkt. No. 13-1, at 12). "Based upon all of these projections, the steps taken by the County to make various cuts and savings to reach a conservative number of $12–13 Million Dollars is appropriate." (Dkt. No. 13-1, at 12).

The updated revenue shortfall estimates reflected additional losses in sales tax, from $3.5 million to $3.86 million, and in state aid, from $3.5 million to $4.38 million, reflecting an overall projected loss of $13.2 million (an increase of $1.2 million). (Dkt. No. 13-3, ¶ 12). Treasurer Keeler explained that this "updated number" is based, in part on "revenue received between March and May as compared to 2019." (Dkt. No. 13-3, ¶ 13). While Treasurer Keeler found the information provided in the NYSAC report was "important," "it could not supplant the local knowledge and data available to me and others within the County when making assessments" and that this knowledge "coupled with [his] experience as Treasurer, drove [his] projections." (Dkt. No. 13-3, ¶ 15).

"In mid-to-late May 2020, the County determined it would proceed with a limited furlough plan for the Sheriff's Department," which employed members of the Corrections Union and Deputies Union." (Dkt. No. 13-4, ¶ 18). The proposed furlough was "six days, 1 day per month for six months." (Dkt. No. 13-4, ¶ 18). "This reduced plan was designed to address public safety, the 24/7 nature of the operations, and the fact that both unions were operating under expired contracts." (Dkt. No. 13-4, ¶ 18). Calls were held between the County, the Corrections Union, the Deputies Union, and their representatives. (Dkt. No. 13-4, ¶ 19). The unions requested information as to the payroll savings the County sought to obtain with the six-day furloughs. (Dkt. No. 13-4, ¶ 19).

According to Sheriff Bartlett, when the County began discussions "on additional needed payroll savings," the "Board seemed amendable to examine a 6 day furlough for both unions as opposed to a 13 day furlough" if "additional cuts could be made." (Dkt. No. 13-2, ¶¶ 15, 17). "This furlough would represent 1 day a month for six months, as opposed to 13 days." (Dkt. No. 13-2, ¶ 17). "The County would also require an overall permanent reduction of Corrections staff

of five positions through anticipated attrition between May and December 2020." (Dkt. No. 13-2, ¶ 17). The "reduced furlough" for the Corrections Union and Deputy Sheriff's Union "was a result of several factors: public safety, the fact that [they] operate [the] departments 24/7, certain statutory requirements set by New York State, and the potential that a furlough would cause overtime," which "would be counterproductive." (Dkt. No. 13-2, ¶ 16). Sheriff Bartlett also "came up with cost savings on both sides," including eliminating positions that were open, reducing overtime, and cost saving measures to payroll costs. (Dkt. No. 13-2, ¶¶ 15, 18).

On May 20, 2020, following discussions with the Deputies Union and Corrections Union, Sheriff Bartlett sent a letter to Chairman Murell with a proposal:

> After speaking with my staff and reviewing staffing schedules for the Corrections Division, filling of furlough positions would be impossible without a massive increase of overtime shifts. Currently, the Corrections Division has been reducing overtime by utilizing transport officers who have been available due to courts being closed. I believe that the proposal for the Corrections Division listed below is the only possible avenue without creating overtime.
>     Below is a possible proposal regarding the Correction Officers that would be an alternative to furloughs.
>
> • 6 Furlough Days for all Jail Employees = $68,820.72
> • Line up Pay for 14 Pay Periods (June 6-Dec 18) = $69,682.49
>         o Line up Pay is 2.25 hours of overtime every pay period.

(Dkt. No. 13-2, at 10). Sheriff Bartlett states that the information he included in this letter "was based upon my understanding of agreeable terms to the two unions" and that he "presented these proposals to the working group and they were supportive." (Dkt. No. 13-2, ¶ 21).

Sheriff Bartlett then met "with each union to discuss and finalize these proposals." ((Dkt. No. 13-2, ¶ 21). Following the meeting, the Deputies Union executed a Memorandum of Understanding that provided for $88,333.84 in savings, "slightly over the requested concession

amount of $88,229.27," and included "a reduction in line up pay and on call pay, as well as forgoing physicals." (Dkt. No. 13-2, ¶ 22).

When Sheriff Bartlett met with the Corrections Union, however, "they indicated that they would not . . . provide give backs but rather wanted to merely delay the payment of these proposed changes."[10] (Dkt. No. 13-2, ¶ 23). "This was not [Sheriff Bartlett's] understanding as to their initial proposal." (Dkt. No. 13-2, ¶ 23). The Corrections Union "argued it was unfair to give up line up pay because they would have to be there, and at least other County employees were furloughed and received a day off." (Dkt. No. 13-2, ¶ 24). Following this discussion, Sheriff Bartlett "was left with the impression and the hope that a counter response would be provided" but "[n]othing ever followed." (Dkt. No. 13-2, ¶ 24).

On May 29, 2020, Plaintiff Corrections Union President Matthew Hogencamp participated in a conference call with the County's labor attorney, Elena DeFio Kean, "seeking various cost-cutting measures, such as such as voluntary work furloughs or a temporary seven (7) month waiver of pay for pre-shift lineup; and in the alternative, threatened with potential layoffs." (Dkt. No. 2-1, ¶ 10). According to President Hogencamp, the Corrections Union rejected these proposals "[f]or various reasons," "including that fact that cost-cutting measures had previously been imposed by the County Sheriff's Office, including a hiring freeze on two (2) unfilled positions in Corrections, and rescheduling the transport officers' time to other shifts to reduce overtime." (Dkt. No. 2-1, ¶ 11). The County rejected the Corrections Union's proposal "to lag pre-shift lineup pay, to enable to County to pay for time worked at a later date." (Dkt. No. 2-1, ¶ 11). The Corrections Union proposed lag pay, as opposed to a "give back" of line up pay, because it believed that its employees "are entitled to pay for pre-shift lineups, and that payment

---

[10] The concession the County sought from the Corrections Union was $68,820.72. (Dkt. No. 13-2, ¶ 22).

was nevertheless mandatory under the Fair Labor Standards Act and New York Labor Law." (Dkt. No. 2-1, ¶ 11). President Hogencamp asked County officials for "economic analysis or basis to substantiate its purported claim of a 15–20 million dollar projected loss of revenue," but has received none. (Dkt. No. 2-1, ¶ 11).

On June 4, 2020, "[h]aving received no other proposals" from the Corrections Union and because the Corrections Union had "referenced that at least other employees actually received a day off instead of just a give back, [the County] proceeded with the least impactful option" and passed Resolution 163-2020. (Dkt. No. 13-1, at 13; Dkt. No. 2-11, at 1–2). It provided that: "Corrections Members will participate in a 6 day furlough, totaling $65,442.94."[11] (Dkt. No. 2-11, at 1). In doing so, the County relied on Sheriff Bartlett's representation that "this 1 day per month furlough will not result in overtime or any negative impact to the safety and security of the County." (Dkt. No. 13-1, at 13). Sheriff Bartlett explained that the furlough was "a temporary change designed to address county needs and its residents" and would not "result in overtime." (Dkt. No. 13-2, ¶ 25). Sheriff Bartlett further explained "staffing for the jail has been reduced on a temporary basis by Commission on Corrections" and that the jail, which "is staffed based on having an inmate population over 125," "has been housing approximately 25–38 inmates a day." (Dkt. No. 13-2, ¶ 25).

"Following the adoption of Resolution No. 163-2020, the Columbia County Sheriff's Office imposed involuntary furlough days on members of the Corrections Officers Union, commencing on June 11, 2020." (Dkt. No. 2-1, ¶ 14). Starting on June 11, 2020, "[n]otice of the involuntary furlough days were written on the daily assignment sheets (Columbia County

---

[11] Resolution 163-2020 refers to $65,442.94, (Dkt. No. 2-11, at 1), but the parties refer to a savings as a result of the furlough at issue in the amount of $68,820.72. (*See, e.g.*, Dkt. No. 13-2, at 1). The record does not appear to explain why there are two different amounts; the Court utilizes $68,820.72 for convenience.

Sheriff's Office Sign In/Out Report for Corrections)." (Dkt. No. 2-1, ¶ 14). Although the current CBA "agreed that the normal work week for all employees shall consist of five (5) consecutive work days," (Dkt. No. 2-1, ¶ 16), Sheriff Bartlett, relying on Article III, Section 1(A), of the CBA, which provides that: "[t]he foregoing work schedules are subject to temporary change at the discretion of the Sheriff in the event such change is required by special or unusual circumstances," "altered the work week one week a month by reducing it to four days versus five." (Dkt. No. 13-2, ¶ 29; Dkt. No. 2-2, at 12).

According to President Hogencamp, the involuntary furlough "reduc[es] an employee's pay approximately five (5%) percent for six (6) months" and "adversely affects the Union's members' ability to support themselves and their families, including their ability to pay rent, mortgages or car payments; buy necessities such as food, clothing, or fuel; pay educational expenses; and, otherwise satisfy outstanding financial commitments." (Dkt. No. 2-1, ¶ 19).[12] According to Sheriff Bartlett, "[p]ursuant to [the CBA's] grievance procedure, the parties are obligated to confer on [a] grievance"; Bartlett has "never received a grievance from the [Corrections] Union." (Dkt. No. 13-2, ¶¶ 26, 28).

## III.   STANDARD OF REVIEW

Rule 65 of the Federal Rules of Civil Procedure governs temporary restraining orders and preliminary injunctions. In the Second Circuit, the standard for a temporary restraining order is the same as the one for a preliminary injunction. *See Fairfield Cty. Med. Ass'n v. United Healthcare of New Eng.*, 985 F. Supp. 2d 262, 270 (D. Conn. 2013), *aff'd*, 557 F. App'x 53 (2d

---

[12] Hogencamp also asserts that the involuntary furlough adversely affects "the retirement/death benefit of members who are nearing retirement/vesting from the New York State and Local Retirement System, since such benefits are calculated based upon an employee's salary." (Dkt. No. 2-1, ¶ 20).  Defendants dispute this, citing to the fact that the Plaintiffs did not receive a raise in 2020, and retirement and death benefits are based on a final average salary. (Dkt. No. 13, at 13 (citing N.Y. Retirement and Social Security Law § 608(a))).

Cir. 2014); *AFA Dispensing Grp. B.V. v. Anheuser-Busch, Inc.*, 740 F. Supp. 2d 465, 471

(S.D.N.Y. 2010).

A party seeking a preliminary injunction must establish that: (1) it is likely to suffer

irreparable harm in the absence of preliminary relief; (2) either (a) it is likely to succeed on the

merits, or (b) there are sufficiently serious questions going to the merits of its claims to make

them fair ground for litigation; (3) the balance of hardships tips decidedly in its favor; and (4) a

preliminary injunction is in the public interest. *Oneida Nation of N.Y. v. Cuomo*, 645 F.3d 154,

164 (2d Cir. 2011); *accord N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, 883 F.3d 32,

37 (2d Cir. 2018). However, "[w]hen, as here, the moving party seeks a preliminary injunction

that will affect government action taken in the public interest pursuant to a statutory or

regulatory scheme, the injunction should be granted only if the moving party meets the more

rigorous likelihood of success standard." *Donohue v. Mangano*, 886 F.Supp.2d 126, 149

(N.D.N.Y. 2012) (quoting *Metro. Taxicab Bd. of Trade  v. City of New York*, 615 F.3d 152, 156

(2d Cir. 2010)); *see also Ass'n of Jewish Camp Operators v. Cuomo*, No. 20-cv-687, 2020 WL

3766496, at *6, 2020 U.S. Dist. LEXIS 117765, at *12 (N.D.N.Y. July 6, 2020).

To the extent the moving party "is seeking to modify the status quo by virtue of a

'mandatory preliminary injunction' (as opposed to seeking a 'prohibitory preliminary injunction'

to maintain the status quo) . . . the movant must also (1) make a 'strong showing' of irreparable

harm, and (2) demonstrate a 'clear or substantial likelihood of success on the merits.'" *Yang v.

Kosinski*, 960 F.3d 119, 127–28 (2d Cir. 2020) (first quoting *Mastrovincenzo v. City of New*

*York*, 435 F.3d 78, 89 (2d Cir. 2006); and then quoting *Doe v. New York Univ.*, 666 F.2d 761, 773 (2d Cir. 1981)).[13]

The parties have not addressed which aspects of the above standards apply here. Plaintiffs assert they have shown both a likelihood of success and sufficiently serious questions going to the merits. (Dkt. No. 2-12, at 18–19). Defendants assert Plaintiffs must demonstrate "'a clear showing of probable success' on the merits" or "sufficiently serious questions going to the merits." (Dkt. No. 13, at 14 (quoting *Haley v. Pataki*, 883 F. Supp. 816, 824 (N.D.N.Y.), *order vacated, appeal dismissed*, 60 F.3d 137 (2d Cir. 1995)). In any event, the Court concludes, for the reasons that follow, that Plaintiffs cannot meet any of these standards.

A.      **Irreparable Harm**

A showing of irreparable harm is "the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (quoting *Rodriguez v. DeBuono*, 175 F.3d 227, 234 (2d Cir. 1999)). "Irreparable harm is 'injury that is neither remote nor speculative, but actual and imminent and that cannot be remedied by an award of monetary damages.'" *New York ex rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 660 (2d Cir. 2015) (quoting *Forest City Daly Hous., Inc. v. Town of North Hempstead*, 175 F.3d 144, 153 (2d Cir. 1999)). "The relevant harm is the harm that (a) occurs to the parties' legal interests and (b) cannot be remedied after a final adjudication, whether by damages or a permanent injunction." *Salinger v. Colting*, 607 F.3d 68, 81 (2d Cir. 2010) (internal footnote omitted).

---

[13] The "status quo . . . is, 'the last actual, peaceable uncontested status which preceded the pending controversy.'" *N. Am. Soccer League*, 883 F.3d at 37 (quoting *Mastrio v. Sebelius*, 768 F.3d 116, 120 (2d Cir. 2014)).

A court will presume that a plaintiff has established irreparable harm in the absence of preliminary relief if the claim involves the alleged deprivation of a constitutional right. *See Mitchell v. Cuomo*, 748 F.2d 804, 806 (2d Cir. 1984) ("When an alleged deprivation of a constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." (quoting 11C Charles A. Wright et al., Fed. Practice & Proc. § 2948 (1st ed. 1973))); *Mangano*, 886 F. Supp. 2d at 150 ("[A]s a general matter, there is a presumption of irreparable harm when there is an alleged deprivation of constitutional rights."). "This notion is not just limited to violations of free speech or due process, but may include violations of the Contract Clause as well." *Mangano*, 886 F. Supp. 2d at 150. While an allegation of a constitutional violation "is insufficient to automatically trigger a finding of irreparable harm," if "the constitutional deprivation is convincingly shown and that violation carries noncompensable damages, a finding of irreparable harm is warranted." *Id.* To "determine whether the constitutional deprivation is convincingly shown" the Court must "assess[ ] the likelihood of success on the merits." *Id.* (citing *Turley v. Giuliani*, 86 F. Supp. 2d 291, 295 (S.D.N.Y. 2000) ("Because the violation of a constitutional right is the irreparable harm asserted here, the two prongs of the preliminary injunction threshold merge into one: in order to show irreparable injury, plaintiff must show a likelihood of success on the merits.")).

Here, as discussed below, Plaintiffs fail to show a likelihood of success with respect to their Contracts Clause claim. The Court notes that Plaintiffs also assert that the "imposition of an involuntary six (6) day furlough, reducing an employee's pay approximately five (5) percent per month for six (6) months, adversely affects the Union's members' ability to support themselves and their families, including: their ability to pay rent, mortgages or car payments [and] buy necessities such as food, clothing, or fuel." (Dkt. No. 2-12, at 14–15; Dkt. No. 2-1, ¶

19). Plaintiffs, however, fail to offer any specifics regarding those losses and resort to generalized assertions. Moreover, this is a furlough of limited duration and the amount at issue, $68,820.72, and the ascertainability of the Corrections Union members entitled to it, are not in question. Thus, Plaintiffs have not sustained their burden of showing irreparable harm. *Sampson v. Murray*, 415 U.S. 61, 90–91 (1974); *see also Int'l Bh'd of Teamsters v. Pan Am.*, 607 F. Supp. 609, 613–14 (E.D.N.Y. 1985) (stating the "clear" law in this Circuit that "lost wages do not constitute irreparable harm where the financial injury falls on an easily ascertainable group of employees capable of ultimately being redressed"); *cf. Donohue v. Paterson*, 715 F. Supp. 2d 306, 316 (N.D.N.Y. 2010) ("Plaintiffs have met their burden of showing that the permanent 20% loss in salary and wages that the furlough plan effects constitutes irreparable harm and that irreparable harm flows from Defendants' failure to pay the contracted-for increases in salaries and wages"); *Mangano*, 886 F. Supp. 2d at 154 ("The possibility of significant economic losses, in addition to the constitutional interference explored above, strengths [sic] the Plaintiffs' arguments that it will be irreparably harmed."). The Court therefore concludes Plaintiffs have failed to show irreparable harm.

      **B.**      **Likelihood of Success**

            **1.**      **Contracts Clause**

      The Contracts Clause of the United States Constitution states that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts." U.S. Const. Art. I, cl. 1. "The Contracts Clause, as applied to governmental contracts, incorporates two differing imperatives": "first . . . the government, like private parties, is bound by its contracts and may not use its governmental powers to impair these contracts materially" and "second . . . the state may not contract away its power to govern in the public interest." *Sullivan v. Nassau Cty. Interim Fin. Auth.*, 959 F.3d 54, 63 (2d Cir. 2020).

"The Contract Clause is not an absolute bar to subsequent modification of a State's own financial obligations," thus, "an impairment may be constitutional if it is reasonable and necessary to serve an important public purpose." *U.S. Tr. Co. of New York v. New Jersey*, 431 U.S. 1, 25 (1977). "To determine if a law trenches impermissibly on contract rights," *Buffalo Tchrs. Fed'n v. Tobe*, 464 F.3d 362, 368 (2d Cir. 2006), a court "must examine": '(1) [whether] the contractual impairment [is] substantial and, if so, (2) [whether] the law serve[s] a legitimate public purpose such as remedying a general social or economic problem and, if such purpose is demonstrated, (3) [whether] the means chosen to accomplish this purpose [are] reasonable and necessary.'" *Sullivan*, 959 F.3d at 64. "If the impairment is insubstantial, or the law is a reasonable and necessary means to remedy a legitimate public purpose, the Contracts Clause is not violated." *Id.*

### a.      Substantial Impairment

"The substantiality of an impairment depends upon 'the extent to which reasonable expectations under the contract have been disrupted.'" *Id.* (quoting *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 993 (2d Cir. 1997). For purposes of the present motion, Defendants acknowledge: (i) that "the workweek and compensation are covered in the CBA" and "represent the reasonable expectations of the parties"; and (ii) that "courts generally view compensation or wage levels as a crucial component of a labor contract." (Dkt. No. 13, at 22). *See Sullivan*, 959 F.3d at 64 ("[W]age levels are a crucial component of labor contracts and are likely to create reasonable expectations."); *see also Buffalo Teachers*, 464 F.3d at 368 (concluding that "the wage freeze so disrupts the reasonable expectations of Buffalo's municipal school district workers that the freeze substantially impairs the workers' contracts with the City.").

21

Defendants argue, however, that Plaintiffs' claim is, at its core, an allegation that Defendants breached the parties' CBA, for which remedies are available under the CBA, and not a substantial impairment. "The Contract Clause is not implicated when state action constitutes a breach of a contract rather than an impairment of a contractual obligation." *Nunez v. Cuomo*, No. 11-cv-3457, 2012 WL 3241260, at *8, 2012 U.S. Dist. LEXIS 110867, at *24 (E.D.N.Y. Aug. 7, 2012) (citing *TM Park Ave. Assocs. v. Pataki*, 214 F.3d 344, 349 (2d Cir. 2000) ("[I]t is necessary to distinguish between legislative action that merely breaches the contract and legislative action that impairs it, for only the latter is cognizable under the United States Constitution.")). The Second Circuit has explained that "[t]he distinction between a breach of contract and an impairment of contract 'depends on the availability of a remedy in damages.'" *TM Park Ave.*, 214 F.3d at 349 (*quoting E & E Hauling v. Forest Pres. Dist. of Du Page Cty., Ill.*, 613 F.2d 675, 679 (7th Cir. 1980)). "Thus, where a remedy remains available to the aggrieved party, only a breach of contract has occurred and there is no Contract Clause violation." *Nunez*, 2012 WL 3241260, at *8, 2012 U.S. Dist. LEXIS 110867, at *24 (citing *TM Park Ave.*, 214 F.3d at 349).

Article II, Section 1.A. of the CBA states: "The normal work week for all employees shall not in any event be in excess of forty (40) hours, consisting of five (5) consecutive work days not in excess of eight (8) hours per day." (Dkt. No. 2-2, at 12). It further states: "The foregoing work schedules are subject to temporary change at the discretion of the Sheriff in the event such change is required by special or unusual circumstances. The work schedules may be changed upon mutual agreement of all parties." (Dkt. No. 2-2, at 12). The CBA outlines a "Grievance Procedure" and defines "Grievance" as "any alleged violation of this Agreement or any dispute with respect to its meaning or application." (Dkt. No. 2-2, at 30). The grievance

procedure is initiated by submission of a written grievance, followed by a written response, from

which a party may appeal to the Sheriff, and if not satisfied, submit the grievance to the

Chairman of the Board of Supervisors, who must respond "with a statement of the County's

position on the matter." (Dkt. No. 2-2, at 32). If unsatisfied, the Corrections Union may "refer

the grievance to the arbitration by requesting" the Public Employment Relations Board's

assistance in the arbitration process. (Dkt. No. 2-2, at 32).

       The gravamen of Plaintiffs' claim is that by imposing the one-day furlough over a six-

month period—reducing the five-day workweek to a four-day workweek one week per month for

six months—Defendants unilaterally modified "the wages, hours and other terms and condition

of employment" of members of the Corrections Union, in violation of the CBA. (Dkt. No. 1, ¶

1). Plaintiffs have not utilized the grievance procedure and contend that it would "be futile in the

face of the County Resolution authorizing such furloughs." (Dkt. No. 17, at 14–15). Plaintiffs

assert that the furloughs have caused "non-compensable damages that cannot be remedied in a

breach of contract action" or the grievance process. (Dkt. No. 17, at 14). But Plaintiffs'

argument, does on its face, appear to allege breach of contract: they assert that Article II, Section

1.A. of the CBA requires a five-day workweek and that Defendants' imposition of a four-day

workweek, violates that provision. *See Nunez*, 2012 WL 3241260, at *9, 2012 U.S. Dist. LEXIS

110867, at *25–26 (finding that the plaintiffs pled only a breach of contract and failed to plead

substantial impairment for purposes of a Contracts Clause claim in connection with their

assertion that the CBA "grants them an irrevocable right to location pay adjustment, regardless

of the location" where they are employed, observing that this "raises a question of the proper

interpretation of that section of the CBA"). Moreover, the CBA provides a remedy through its

grievance and arbitration procedure. (Dkt. No. 2-2, at 30–32). Plaintiffs assert the grievance

procedure would be futile, but provide no evidence or caselaw in support of this assertion. In an excess of caution, however, the Court assumes based on their assertion of lost wages that Plaintiffs have established a likelihood of success with respect to substantial impairment.

<b>b.    Public Purpose</b>

"When a state law constitutes substantial impairment, the state must show a significant and legitimate public purpose behind the law." *Buffalo Teachers*, 464 F.3d at 368 (citing *Energy Rsrvs. Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411–12 (1983)). The Second Circuit has explained that "[a] legitimate public purpose is one 'aimed at remedying an important general social or economic problem rather than providing a benefit to special interests'" and "may not be simply the financial benefit of the sovereign." *Id.* (quoting *Sanitation & Recycling Indus.*, 107 F.3d at 993).

Here, Defendants have presented evidence that when the County passed Resolution 163-2020 imposing the furloughs, it acted in response to a mounting fiscal crisis caused by the COVID-19 global pandemic and in an attempt to ameliorate an estimated $13 million shortfall. This appears to satisfy the public purpose requirement. *See Sullivan*, 959 F.3d at 65 ("NIFA acted in order to alleviate what it viewed as a fiscal crisis in the County, and this is a legitimate public purpose with respect to the Contracts Clause.").

Plaintiffs argue that Defendants' actions in this case are "based upon speculative loss of revenue estimates generally projected on a statewide basis" by the NYSAC report, which itself cautions that the forecast is "uncertain" and likely overestimates "the economic impact on upstate counties, such as Columbia County." (Dkt. No. 2-12, at 16). Plaintiffs, however, present no evidence to refute Treasurer Keeler's assertions that his May 2020 projections of County revenue shortfalls were based not only on the NYSAC report but County sales tax reports and financial records. (Dkt. No. 13-3, ¶ 12). Treasurer Keeler averred that the County's "sales tax

24

revenue for March and April 2020 was $4,416,167.05 compared to $6,294,076.78 for the same two month period in 2019." (Dkt. No. 13-3, ¶ 23). The County also received information from the Governor's office indicating that that the County should expect, at a minimum, 20% reduction in state aid—a shortfall of $4,384,872. (Dkt. No. 13-3, ¶ 25). Further, Treasurer Keeler represents that fees the County relies on from County offices, many of which have been shut down, are also down—that County court fees, for example, "are down $400,000 year to date." (Dkt. No. 13-3, ¶ 26). This is sufficient to show public purpose. *See Sullivan*, 959 F.3d at 65 (rejecting the plaintiffs' argument that the defendant county's fiscal crisis "was a 'paper crisis' caused by NIFA's requirement that" the county utilized different accounting principles where the plaintiffs "presented no evidence to undermine NIFA's findings that the County's . . . proposed budget even without" switching accounting principles "would likely lead to a $50 million deficit"). Accordingly, the Court must consider whether to apply the "less deference" standard regarding the reasonableness and necessity of the County's actions. *Id.*

### c.   Less Deference Scrutiny

Where, as here, the contract impaired is public, as opposed to private, the Court must "ask whether there is 'some indicia' that the state impaired the contract out of its own self-interest." *Id.* "If so, then 'less deference' scrutiny applies and 'it must be shown that the state did not (1) 'consider impairing the . . . contracts on par with other policy alternatives' or (2) 'impose a drastic impairment when an evident and more moderate course would serve its purpose equally well,' nor (3) act unreasonably 'in light of the surrounding circumstances.'" *Id.* (quoting *Buffalo Teachers*, 464 F.3d at 370).

Evidence that the government "has engaged in reneging instead of 'genuinely acting for the public good,'" may suffice to show the law at issue is self-serving. *Id.* at 66. "Reneging is, at its core, about impairments imposed to benefit the state financially, or as a matter of political

expediency." *Id.* Evidence of reneging "may take many forms," including: (i) "evidence that the contractual impairment was chosen whether other politically unpopular alternatives were available," (ii) evidence that the law took aim at a narrow class of individuals when its purported goal could be served equally by spreading the necessary sacrifice throughout a broader, and perhaps, more politically powerful base," or (iii) "evidence that the contractual impairment is a response to a well-known, longstanding, problem, as opposed to a change in circumstances." *Id.* at 66–67.

Plaintiffs rely on evidence that the furlough, which would save the County one day of pay per month for six months for each Corrections Union member was, for the County, a better alternative than (i) delaying payment on pre-shift line-up pay, because the County would eventually have to pay for that time at a later date, (ii) borrowing on the $15 million Revenue Anticipation Note, which it would have to pay back with interest, or (iii) using a portion of the County's withdrawal of the $2.8 million of tax stabilization funds to cover the amount it sought from the Corrections Union. (Dkt. No. 13-3, ¶ 31–32). The Court assumes this is enough, at this stage, to warrant application of the "less deference" standard. *See Sullivan*, 959 F.3d at 67 (finding application of "less deference" standard warranted where the plaintiffs showed "potential reneging" through evidence that the "wage freeze potentially benefitted the State of New York financially, as New York had previously shown itself willing to bail out the County in other contexts" and the "County pushed for the wage freeze because alternative savings proposals were unpopular in the news media").

### d.    Reasonableness and Necessity

Applying the "less deference" standard requires the Court to "examine whether the requirements of reasonableness and necessity have been met." *Id.* "The Supreme Court instructs that the extent of the impairment is 'a relevant factor in determining its reasonableness.'" *Buffalo*

*Teachers*, 464 F.3d at 371 (quoting *U.S. Trust Co.*, 431 U.S. at 27). The furlough the County imposed is "relatively minimal"; it represents five percent of Correction Union members' pay. Further, it is prospective and does "not affect past salary due for labor already rendered." *Id.* at 372. Finally, it is temporary; it lasts only six months. Thus, the Court concludes the furlough is likely reasonable. *See id.* ("In sum, the prospective and temporary quality of the wage freeze convinces us of its reasonableness.").

The Court further concludes that Plaintiffs are likely to fail on the issue of necessity. To uphold self-interested impairments of contractual rights from suit under the Contract Clause, the Court must see that the impairments are reasonable and necessary, as established by real and demonstrable consideration of needs and alternatives." *Paterson*, 715 F. Supp. 2d at 324. Although Plaintiffs maintain the County has failed to provide "any economic analysis or basis to substantiate its purported loss of revenue," (Dkt. No. 2-12, at 17), other than the NYSAC report, and that it has not explained "why its targeted savings [of $68,820.72] from Corrections must be obtained," (Dkt. No. 17, at 11), even setting aside the NYSAC report, there is evidence that the County has lost—and will not recoup through state or federal aid—at least $770,000 in sales tax revenue and $400,000 in County Court fees to date, (Dkt. No. 13-3, ¶¶ 23, 26). Further, it appears from the evidence that the County did not target a specific savings from the Corrections Union but "designed" a furlough that took into account "public safety, the 24/7 nature of [Corrections Union] operations, and the fact that both unions were operating under expired contracts," (Dkt. No. 13-4, at ¶ 18), and then calculated the savings that would result. Thus, the Court concludes the County is likely able to substantiate its loss in revenue. Moreover, there is ample evidence that the County not only considered alternatives but examined the employment costs of every department and agency to determine where cuts could be made without having to

layoff employees during a pandemic or cut back necessary services like those the health department and 911 dispatchers provide. (Dkt. No. 13-1, at 10–11). In addition, it has induced every other non-essential department in the County to make internal budget cuts or furlough employees.

Plaintiffs further assert that "the County certainly has the ability to raise revenue through property taxes, fees, fines, and the reduction or shifting in services or programs." (Dkt. No. 17, at 8). Plaintiffs present no evidence in support of this assertion and contrasted with evidence that the County's ability to collect fees when County offices have been shutdown has been severely curtailed, (Dkt. No. 13-3, ¶ 26), the Court concludes their assertion fails to show this was a viable alternative. *See Sullivan*, 959 F.3d at 68–69 (considering necessity of wage freeze and concluding that given the evidence that the state was experiencing a "financial crunch," "even if the state could have raised its taxes, [there was no reason to believe] any monies so raised would flow to [the County]." (alteration in original) (quoting *Buffalo Teachers*, 464 F.3d at 372)). Finally, while the County could, as Plaintiffs assert, tap into the $15 million Revenue Anticipation Note, such an action would not allow the County to balance its unexpectedly contracted budget but only displace and, ultimately, increase its financial obligations. As the Second Circuit has explained: "[w]hether the legislation is wise or unwise as a matter of policy is a question with which we are not concerned"; "[o]ur job is simply to determine whether [the government action] was imposed to renege on a contract (to get out of a bad deal) or as a governmental action intended to serve the public good, as the government saw it." *Id.* at 69 (quoting *Home Bldg. & Loan Ass'n v. Blaisdell*, 290 U.S. 398, 447–48, (1934). Accordingly, the Court concludes that Plaintiffs are unlikely to prevail on the issues of reasonableness and

necessity. Plaintiffs, therefore, are not entitled to a preliminary injunction with respect to their Contracts Clause claim.

### 2.   State Claims

Plaintiffs assert that by "unilaterally alter[ing] terms and conditions of employment negotiated with" the Corrections Union "and contained in the parties' CBA," Defendants violated the New York Constitution, which prohibits "local governments . . . from adopting local laws that are inconsistent with either the constitution itself or any general laws," including the "right of employees to organize and bargain collectively." (Dkt. No. 2-12, at 21–22). For the same reason, Plaintiffs argue, Defendants have violated New York Municipal Home Rule Law § 10, which prohibits local governments from enacting laws inconsistent with the state constitution and general laws, including the Taylor Law, which makes it in improper practice for a public employer "to refuse to negotiate in good faith" with public employees. N.Y. Civ. Serv. Law § 209-a(1)(d). (Dkt. No. 2-12, at 22–23).

"Section 2(c) of Article IX of the New York State Constitution sets forth the framework of municipal home rule in New York" and "authorizes cities and other local governments to adopt local laws relating to their 'property, affairs or government' so long as such laws are 'not inconsistent with the provisions of this constitution or any general law.'" *Molinari v. Bloomberg*, 596 F. Supp. 2d 546, 558 (E.D.N.Y.) (quoting N.Y. Const. Art. 9, § 2(c)), *aff'd*, 564 F.3d 587 (2d Cir. 2009). New York Municipal Home Rule Law, § 10 implements Article IX of the New York Constitution and "tracks the language of the NY Constitution in that it grants to a 'county, city, town or village' the authority 'to adopt and amend local laws,'" *Boening v. Nassau Cty. Dep't of Assessment*, 157 A.D.3d 757, 760 (2d Dep't 2018), "not inconsistent with the provisions of the constitution or not inconsistent with any general law." N.Y. Mun. Home Rule Law § 10(1). As relevant here, section 17 of Article I of the New York Constitution provides that

"[e]mployees shall have the right to organize and to bargain collectively," and the New York

Civil Service Law, known as the Taylor Law,[14] states "the appropriate public employer . . . is

required to negotiate collectively with such employee organization in the determination of . . .

the terms and conditions of employment of the public employees," including "with respect to

wages [and] hours" and that it is "an improper practice for a public employer . . . to refuse to

negotiate in good faith with the duly recognized or certified representatives of its public

employees." N.Y. Civ. Serv. Law §§ 204(2)–(3), 209-a(1)(d).

The Taylor Law, that is, the statutory duty to bargain in good faith, is not always

implicated when a dispute concerning a CBA arises. It is not, for example, implicated when a

dispute "over terms of employment expressly provided for the in CBA" arises. *Roma v. Ruffo*, 92

N.Y.2d 489, 494 (1998). This is because the parties will have already fulfilled their duty under

the Taylor law of negotiating and reaching an agreement on the provision at issue. *Id.* It is,

however, implicated when "disputes concerning new matters" that are not governed by the

existing CBA and which the parties, therefore, have not yet negotiated. *Id.*

In *Roma*, the defendant school notified the plaintiff school matrons "that their daily work

schedule was to be reduced from eight hours to six." 92 N.Y.2d at 492. The school matrons filed

a grievance "[p]ursuant to the . . . grievance machinery of the CBA" arguing that the CBA

provided that "matrons . . . shall normally work an eight (8) hour day, forty (40) hour week *Id.* at

493. Following the grievance procedure, during which the school matrons were unsuccessful, the

school matrons brought an Article 78 proceeding in New York Supreme Court "to challenge the .

. . determination that the district had not breached the CBA." *Id.* The state supreme court "held

---

[14] The Taylor Law is a "general law" as defined in the New York Constitution. *See* N.Y. Const., art. IX, § 3(d)(1)
(defining "general law" as "[a] law which in terms and in effect applies alike to all counties, all counties other than
those wholly included within a city, all cities, all towns or all villages").

that the terms of the CBA were clear" and barred the "school district from a unilateral reduction

in daily working hours of matrons." *Id.* On appeal, the school argued, and the Appellate Division

agreed, that the lower court "lacked subject matter jurisdiction because the gravamen of the

petition was a violation of the school['s] statutory duty to negotiate in good faith under the

Taylor Law, and, thus, was within the exclusive jurisdiction of the PERB." *Id.* (citing N.Y. Civ.

Serv. Law § 209-a(1)(d)). The New York Court of Appeals reversed, explaining that the school

matrons alleged that the school "breached the CBA by unilaterally changing a working condition

*expressly covered* by the CBA—the eight-hour working day for the matron position." *Id.* at 494.

It explained:

> The Taylor Law does not alter basic contract law principles
> regarding the finality and binding effect of terms and conditions
> upon which full agreement was achieved, merely because the
> contract in dispute is a collective bargaining agreement. Once the
> parties have performed their obligation under the Taylor Law of
> negotiating to the point of reaching an agreement on the subjects
> expressly covered by the CBA, that exhausts their statutory duty to
> bargain as to those subjects. Thus, when the dispute between the
> public employer and the employees' representative arises during the
> term of an existing CBA, the statutory duty to bargain collectively
> (Civil Service Law § 204) and the improper practice of failing to do
> so in good faith (Civil Service Law § 209-a [1] [d]) apply only when
> the parties' dispute is outside the terms of the CBA, but *not* when
> the condition of employment in question is expressly provided for
> in the parties' agreement.

*Id.* It further explained that there is a distinction between "disputes over terms of employment

expressly provided for the in CBA, that is, involving 'rights recognized by the agreement,'"

which are "resolvable through the grievance/arbitration mechanism of the contract," and

"disputes concerning new matters which, upon impasse, will be resolvable by the dispute

resolution procedures" of the Taylor Law. *Id.* (quoting *City of Newburgh v. Newman*, 69 N.Y.2d

166, 170 (1987). The Court of Appeals also noted that PERB "has consistently recognized that

disputes over subjects that have been expressly settled by the parties' CBA do not invoke the statutory duty to bargain in good faith."[15] *Id.* at 495.

In this case, Article II, Section 1.A. of the CBA provides that a "normal work week for all employees shall not in any event be in excess of forty (40) hours, consisting of five (5) consecutive work days not in excess of eight (8) hours per day," with specifically-described workday shifts, and further provides that the "work schedules are subject to temporary change at the discretion of the Sheriff in the event such change is required by special or unusual circumstances." (Dkt. No. 2-2, at 12).[16] Resolution 163-2020 provides that "Corrections Members will participate in a 6 day furlough, totaling $65,442.94." (Dkt. No. 2-11, at 1). Sheriff Bartlett, consequently, "altered the work week one week a month by reducing it to four days versus five," in accordance with his "ability in [his] discretion to temporarily change the work schedules as required by special or unusual circumstances." (Dkt. No. 13-2, ¶ 29). The Court concludes that Resolution 163-2020 and Sheriff Bartlett's alteration of the work week, without "mutual agreement" of the parties, appear to concern express, already bargained-for provisions of the CBA, and that any dispute regarding Defendants' actions does not appear to implicate the Taylor Law, or, by extension, suggest a likely violation of the New York Constitution or Municipal Home Rule Law § 10. *See Roma*, 92 N.Y.2d at 494 (explaining that the Taylor Law

---

[15] In support of their argument, Plaintiffs cite *Cliff v. Blydenberg*, 173 Misc. 2d 366 (Sup. Ct. Nassau Co. 1997). In *Cliff*, five unions filed suit seeking a declaration that a local law imposing a salary cap that counted, as salary, benefits such as overtime, on county employees was invalid and unenforceable. 173 Misc. 2d 367–68. Three of the CBAs contained "a partial [salary] caps," which, unlike the local law, excluded certain benefits as salary; the two other CBAs contained no salary caps. *Cliff*, 173 Misc. 2d at 370–71. The court found that the local law violated, inter alia, the New York Constitution and Municipal Home Rule Law § 10 by abrogating "the limitations placed on local government by the Taylor Law, absent negotiation of any such [salary] maximum with the employees' bargaining representative and ratification of this contract provision by the employee members." *Cliff*, 173 Misc. 2d at 371. Here, in contrast, the CBA, expressly addresses the number of workdays per week, thus it is unlike the CBAs in *Cliff*, which, in some instances, contained no provisions addressing the limitations imposed by local law.

[16] The CBA further provides that the "work schedule may be changed upon mutual agreement of the parties." (Dkt. No. 2-2, at 12).

applies "only when the parties' dispute is *outside* the terms of the CBA") (emphasis added).

Accordingly, Plaintiffs have failed to show a likelihood of success with respect to their state law

claims and are not entitled to preliminary injunctive relief.

### C. Balance of Hardships

"[T]he balance of hardships inquiry asks which of the two parties would suffer most

grievously if the preliminary injunction motion were wrongly decided." *Goldman, Sachs & Co.*

v. *Golden Empire Schs. Fin. Auth.*, 922 F. Supp. 2d 435, 444 (S.D.N.Y. 2013) (alteration in

original) (quoting *Tradescape.com v. Shivaram*, 77 F. Supp. 2d 408, 411 (S.D.N.Y. 1999)).

Plaintiffs assert that the "imposition of an involuntary six (6) day furlough, reducing an

employee's pay approximately five (5%) percent per month for six (6) months, adversely affects

the Union's members' ability to support themselves and their families, including: their ability to

pay rent, mortgages or car payments [an] buy necessities such as food, clothing, or fuel." (Dkt.

No. 2-12, at 14–15; Dkt. No. 2-1, ¶ 19). The Court therefore concludes that the balance of the

hardships tips in Plaintiffs' favor. However, without a showing of a likelihood of success on the

merits, or even a sufficiently serious question going to the merits with respect to any claim, this

factor, alone, is insufficient to warrant injunctive relief.

### D. Public Interest

"The court must ensure that the 'public interest would not be disserved' by the issuance

of a preliminary injunction." *Salinger*, 607 F.3d at 80. A preliminary injunction shall not issue in

this case, thus the Court need not consider the public interest. *U.S. S.E.C. v. Citigroup Glob.*

*Mkts. Inc.*, 673 F.3d 158, 163 n.1 (2d Cir. 2012) ("[W]hen a court orders injunctive relief, it

should ensure that injunction does not cause harm to the public interest.").

## IV. CONCLUSION

For these reasons, it is hereby

**ORDERED** that Plaintiffs' motion for a temporary restraining order and preliminary injunction (Dkt. No. 2) is **DENIED**.

**IT IS SO ORDERED.**

Dated: August 27, 2020
        Syracuse, New York

Brenda K. Sannes
U.S. District Judge